**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| CARL S. FULMORE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:11-cv-0389-TWP-TAB |
| | ) |
| M&M TRANSPORT SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |

<u>**ENTRY ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

This matter is before the Court on Defendant M&M Transport Services, Inc.'s ("M&M") Motion for Partial Summary Judgment. This dispute arises from the Plaintiff Carl S. Fulmore's ("Mr. Fulmore") employment relationship with M&M. Mr. Fulmore filed a five count amended complaint alleging claims of intentional race discrimination, race retaliation and workers compensation retaliation being committed by M&M. *See* 42 U.S.C. §§ 1981, 1981(a), 2000(e), *et seq.*; Ind. Code § 22-3-2-15. In addition, Mr. Fulmore alleges M&M committed violations under the Family Medical Leave Act ("FMLA"), the Indiana Wage Payment Statute, and the Indiana Wage Claims Statute during his employment. *See* 28 U.S.C. §§ 2601 *et seq.*; Ind. Code §§ 22-2-5 and 22-2-9. For the reasons set forth below, M&M's Motion for Partial Summary Judgment (Dkt. 33) is **GRANTED** in part and **DENIED** in part.

## I.   <u>BACKGROUND</u>

**A.   Mr. Fulmore Begins Employment as an Over-the-Road Truck Driver**

The following facts are presented in a light most favorable to Mr. Fulmore, the non-moving party. On December 8, 2006, Mr. Fulmore, an African-American male, was hired by M&M as an over-the-road truck driver. M&M is a transportation provider, and its customers are

some of the largest retail, manufacturing, distribution, and logistic companies in the United States. M&M's fleet consists of approximately 300 tractors and 1,000 trailers. In its Indianapolis location, M&M employs approximately 125 drivers. One company for which M&M provides transportation services is the CVS Pharmacy Distribution Center located in Indianapolis, Indiana. After becoming employed with M&M, Mr. Fulmore began to drive the company's tractor-trailer trucks in order to perform his job responsibilities.

**B.** **Mr. Fulmore Experiences Racial Hostility at M&M**

Mr. Fulmore was employed with M&M from December 8, 2006 until February 22, 2010. During the course of his employment, he was subjected to racially hostile speech and worked in an environment where management condoned such racially hateful speech. White employees and managers such as Gary McCormick and Rick Sperry used racially charged words such as "nigger" and "black motherfucker", told racially offensive jokes, and made other racially offensive statements. Mr. Fulmore claims he reported this behavior to the owner, and no appropriate action was taken to address his concerns. Additionally, Mr. Fulmore believes he was subjected to disparate scheduling, which resulted in less preferential routes and assignments. Dkt. 48-7at 2.

**C.** **Mr. Fulmore is Involved in Multiple Work-Related Driving Incidents**

On February 5, 2007, Mr. Fulmore was involved in an incident with his tractor trailer. Mr. Fulmore hooked up his assigned trailer to the truck and performed a tug test as required to ensure that the trailer was properly connected. Upon tugging on the trailer, the coupling came apart and the trailer came unhooked which resulted in a crossmember and side rail on the trailer being bent. After an internal investigation the company determined that this was a preventable accident. A preventable accident is an accident where the driver is at fault or could have

foreseen the accident and avoided it based on the driver's licensure and knowledge.  Dkt. 48-12 at 2.  On June 6, 2007, while making a delivery to a CVS store, Mr. Fulmore attempted to back his tractor-trailer truck across a street because there was no other entry for access due to the location of a storage container in the CVS parking lot.  While backing up, Mr. Fulmore's passenger side wheel struck a small tree, the size of a broomstick, which had been planted in the sidewalk.  The damage to the tree was $50.00.  The company issued an internal report and found this was a preventable accident.  On July 25, 2007, Mr. Fulmore was backing into a different CVS location in order to unload his truck, when he damaged a yellow pole located in the parking lot.  The damage consisted of yellow scrapes on the side of the trailer and the pole being knocked out of place.  CVS was paid $1,022.22 for the damage to the pole.  M&M also determined that this accident was preventable.

Following these incidents, Mr. Fulmore received two speeding citations and two warnings for excessive speed while performing his job duties.  Specifically, Mr. Fulmore received a citation for speeding on August 19, 2007 by the Indiana State Police.  On August 23, 2007, M&M sent a warning letter to Mr. Fulmore which stated in relevant part, "Please understand that this is the last warning you will receive, and that any further violations of this nature will result in further disciplinary action…." Dkt. 35-1 at 5.   However, Mr. Fulmore denies receiving the warning letter.  Dkt. 48-2 at 4.

On December 26, 2007, Mr. Fulmore received a warning from the Indiana State Police for driving over the speed limit.  On January 23, 2008, Mr. Fulmore damaged the right front outside tire and rim on his trailer when he clipped the corner of a concrete barrier while pulling away from the fuel pumps at a gasoline station.  The estimated loss for damage to the tire and rim was $500.00.  Again, M&M determined that this was a preventable accident.  Mr. Fulmore

alleges that other drivers are not charged for such incidents as preventable accidents, however he has not designated any evidence concerning these other drivers.  Subsequently, M&M issued Mr. Fulmore a final warning and placed him on twelve months' probation.  The warning specifically stated, "any violation, warning, unfavorable log audit, or preventable accident within the next 12 months will result in immediate termination of your employment."  Dkt. 35-1 at 5.

**D.**     **Mr. Fulmore is Injured at Work and Takes a Leave of Absence**

On August 25, 2008, Mr. Fulmore sustained an injury to his left shoulder while at work when boxes of liquor fell on him.  After reporting the injury to M&M, Mr. Fulmore went on FMLA leave.  On August 27, 2008, Mr. Fulmore applied for disability benefits with M&M's disability insurance carrier, American Fidelity Assurance Company; he received disability benefits and remained on leave until May 27, 2009.  In July 2009, Charles Cooper ("Mr. Cooper") was hired as the Safety Manager at M&M's Indianapolis location. ,

Following Mr. Fulmore's return to work, he was involved in an accident at the CVS Pharmacy Distribution Center in Indianapolis, Indiana on October 27, 2009.  Specifically, Mr. Fulmore was backing into the loading dock when his tractor-trailer truck struck another owner/operator near door 64 at the distribution center.  Mr. Cooper investigated the accident and concluded that "Mr. Fulmore should have been able to see the owner/operator of the other truck without looking out of his rear view mirrors, which would have prevented the accident."  Dkt. 35-3 at 2.  As a consequence, Mr. Cooper issued a second warning letter on November 6, 2009 and placed Mr. Fulmore on a 12 month probationary period.  The November 6, 2009 warning letter stated "should you [Mr. Fulmore] be involved in another preventable accident within twelve (12) months, M&M will take stronger disciplinary action which may include suspension and/or termination of your employment with M&M Transport."  Dkt. 35-3 at 5.  On December

31, 2009, the Indiana State Police issued Mr. Fulmore a warning for speeding while performing his duties for M&M.

**E.      M&M Terminates Mr. Fulmore's Employment with the Company**

Len Mariotti ("Mr. Mariotti"), M&M's new Director of Safety and Department of Transportation ("DOT") Compliance, was hired by the company in November 2009 after working as a director of safety for another transportation company.  On February 10, 2010, Mr. Fulmore was traveling to a CVS location in Waukegan, Illinois in winter weather conditions. Mr. Fulmore was traveling at 40-45 miles per hour when he encountered black ice and a strong gust of wind that pushed his unit to the right and into a ditch.  The truck and trailer overturned. Mr. Mariotti conducted an internal investigation.  M&M has access to a system which tracks a driver's speed at approximately five minute intervals.  Although Mr. Fulmore reports that he was traveling at 45 mph at the time of the accident, Mr. Mariotti concluded that based upon the truck's speed tracking device, Mr. Fulmore was traveling at 54 mph at 9:23 a.m.  The accident occurred at 9:28 a.m., therefore Mr. Mariotti concluded Mr. Fulmore was driving at 54 mph at the time of the accident and was driving too fast given the weather conditions, making the accident preventable.  This accident resulted in more than $10,000.00 in property loss and a $4,570.00 towing bill.  Additionally, Mr. Fulmore sustained injuries and was transported to a local hospital to undergo medical treatment.

Following the February 10, 2010 accident, Mr. Mariotti launched an extensive investigation of Mr. Fulmore's work performance with M&M.  During the course of his investigation, he discovered that Mr. Fulmore had been involved in several accidents which M&M considered preventable accidents, as well as having received a number of citations and warnings from law enforcement for speeding while performing his duties.  On February 17,

2010, Mr. Mariotti received a letter from Geist Family Medicine about Mr. Fulmore's injuries as a result of the February 10, 2010 accident.   According to Mr. Mariotti, this was the first time he became aware of the fact that Mr. Fulmore was injured in the February 10, 20102010 accident. After receiving this information, Mr. Mariotti contacted M&M's worker's compensation insurance carrier, Liberty Mutual Insurance, and informed it about Mr. Fulmore's injury.  As a result, Mr. Fulmore received worker's compensation benefits for lost wages and medical treatment.

At the conclusion of his investigation, Mr. Mariotti determined that Mr. Fulmore was a danger to himself as well as others.  Accordingly, Mr. Mariotti prepared a letter on February 22, 2010 informing Mr. Fulmore of his termination due to an unacceptable safety record.  Mr. Fulmore received the letter of termination on March 17, 2010.

**F.     Mr. Fulmore Applies for Unemployment Compensation Benefits**

After being terminated from M&M, Mr. Fulmore sought unemployment compensation benefits from the Indiana Department of Workforce Development ("IDWD").  On April 7, 2010, M&M received a document entitled "Request For Information/EF WKPF" from the IDWD concerning Mr. Fulmore's employment with M&M.  On April 16, 2010, M&M responded to the IDWD's request by stating that it terminated Mr. Fulmore for having an "unsatisfactory safety record," which included accidents and speeding violations.  Subsequently, Mr. Fulmore was denied unemployment compensation benefits.  However, on May 5, 2010 Mr. Fulmore appealed his denial of benefits by the IDWD to an administrative law judge ("ALJ").  The ALJ reversed the initial decision by the IDWD which had denied benefits from Mr. Fulmore.  The ALJ found that Mr. Fulmore was not discharged by M&M for just cause as defined by Indiana Code § 22-4-15-1.   In his findings, the ALJ indicated the police officer that investigated the accident

determined Mr. Fulmore was not at fault for the February 10, 2010 accident and found that the tracking device which showed Mr. Fulmore was driving at 54 mph five minutes before the accident did not prove he was driving too fast for the conditions. Subsequently, Mr. Fulmore filed multiple Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging retaliation and discrimination.  Mr. Fulmore charged that "white truck drivers such as Jim Berry, Andy Everett and McCormick were involved in terminable accidents and had similar safety records and have not lost their jobs".  Dkt. 48-7 at 2.  On March 21, 2011, Mr. Fulmore filed this present action and on September 12, 2011, filed a second amended complaint which included five counts against M&M.  Additional facts are added below as needed.

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001)

(citation and internal quotations omitted).  "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment."  *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III.  DISCUSSION

In his five count amended complaint, Mr. Fulmore alleges that M&M intentionally discriminated against him as well as retaliated against him on the basis of his race in violation of Title VII.  Additionally, Mr. Fulmore alleges that as an African American employee at M&M he was subjected to a hostile work environment in violation of Title VII.  Furthermore, he claims that M&M retaliated against him with respect to his terms, conditions, and privileges of employment in violation of Indiana Code § 22-3-2-15 because he filed for a worker's compensation claim.  Lastly, Mr. Fulmore alleges that the actions of his supervisors throughout the end of his employment and beyond constituted violations of both the FMLA and Indiana Wage Payment Statute and Wage Claims Statute.  M&M responds by arguing that Mr. Fulmore's Title VII claims fail as a matter of law because he cannot establish a *prima facie* case for his intentional discrimination claim or his retaliation claim.  In addition, M&M argues that Mr. Fulmore's remaining claims concerning a hostile work environment, worker's compensation, and FMLA are without merit.  As such, it contends that the Court should grant its partial summary judgment motion.  The Court will address these issues in turn.

### A.    Initial Discovery Issue

As an initial matter, before the Court can rule on the substantive issues relating to Mr. Fulmore's claims in M&M's motion, the Court must resolve an issue raised by Mr. Fulmore involving the discovery process.  Specifically, Mr. Fulmore objects to M&M's use of Mr.

Mariotti's affidavit as evidence of its legitimate employment decision to terminate his employment. The basis of his objection stems from the fact that M&M did not provide Mr. Mariotti's personnel file as well as the personnel files of other similarly situated employees to Mr. Fulmore after he sent his request for production of documents. *See* Dkt. 48-1 at 12. Additionally, Mr. Fulmore contends that M&M, in its response to his request, stated that such files were not relevant. As such, Mr. Fulmore claims that M&M may not reference such evidence in an affidavit in support of its summary judgment motion. *See* Fed. R. Civ. P. 37(c)(1) (stating that when a party fails to provide information, pursuant to Rule 26(a) or (e), the party is not allowed to use that information to supply evidence on a motion, unless the failure was substantially justified or harmless).

M&M counters by arguing that it may utilize Mr. Mariotti's affidavit as evidence in its motion because he is the custodian and is qualified to speak from personal knowledge that the documents are admissible as business records. *See* Dkt. 55 at 1-2. For a document to be admissible as a business record, the document must have sufficient indicia of trustworthiness to be considered reliable. *Woods v. City of Chi.*, 234 F.3d 979, 988 (7th Cir. 2010). Importantly, pursuant to Rule 803(6), "[a] party establishes a foundation for admission of business records when it demonstrates through the testimony of a qualified witness [or a custodian] that the records were kept in the course of a regularly conducted business activity, and that it was the regular practice of that business to make such records." [1] *United States v. Reese*, 666 F.3d 1007,

---

[1] Specifically, Rule 803(6) provides the following:

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11 [or] Rule 902(12).

1017 (7th Cir. 2012) (citing Fed.R.Evid. 803(6)). Furthermore, "[t]he custodian of the records need not be in control of or have individual knowledge of the particular corporate records, but need only be familiar with the company's recordkeeping practices." *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003); *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir. 1985) ("When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence.").

Mr. Fulmore's claim that M&M is barred from utilizing Mr. Mariotti's affidavit because he lacks personal knowledge of the events or because certain documents were not produced to him during discovery is without merit. Importantly, Mr. Mariotti, as the Director of Safety and DOT Compliance for M&M, is a qualified witness to testify that he is familiar with the record-keeping practices of M&M as a custodian of the company's documents. *Thanongsinh v. Board of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006). Moreover, M&M has designated Mr. Mariotti's affidavit, as the custodian of its records who would be able to testify that the personnel files he relied upon in making his decision to terminate Mr. Fulmore qualify as a business record under Rule 803(6). *See Woods*, 234 F.3d at 988 ("[T]o demonstrate such trustworthiness and reliability at the summary judgment stage, the party seeking to offer the business record must attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence at trial…."). As such, Mr. Mariotti would be able to testify as to the time when the documents were created and how they were kept in the course of business as a regular practice. *See* Fed.R.Evid. 803(6). Thus, the designated affidavit of Mr. Mariotti by M&M for purposes of this summary judgment motion constitutes sufficient evidence at this stage of litigation. *Id.*

Additionally, the fact that Mr. Fulmore did not receive certain documents through his first request for production of documents does not automatically make those documents inadmissible for purposes of M&M's partial summary judgment motion.  *See U & I Corp. v. Advanced Med. Design, Inc.*, 251 F.R.D. 667, 674 (M.D. Fla. 2008).  As mentioned above, after M&M responded to Mr. Fulmore's request in a timely manner, Mr. Fulmore objected to M&M's production, claiming in a letter sent to M&M's counsel that it did not produce "any files relating to plaintiff's supervisors, comparators, [or] other complaints…."  Dkt. 56-1 at 3.  M&M replied to the letter by suggesting Mr. Fulmore's counsel should set a conference with the magistrate judge to assist the parties in resolving any remaining discovery disputes.  Dkt. 56-2.  However, despite suggestions by M&M's counsel to Mr. Fulmore suggesting approaches to settle discovery issues, Mr. Fulmore took no steps to resolve the issue before the end of discovery.  Now, at the summary judgment stage, Mr. Fulmore argues that M&M's summary judgment motion should be denied because it failed to produce certain documents in discovery.  The Court disagrees with Mr. Fulmore's reasoning.

Here, Mr. Fulmore has not presented the Court with any reasons as to why he did not take advantage of certain options available to him to resolve his perceived discovery dispute.  For example, Mr. Fulmore could have requested a conference with the magistrate judge as suggested by opposing counsel or filed a motion to compel discovery under Rule 37 of the Federal Rules of Civil Procedure.  However, Mr. Fulmore did not avail himself of either option.  Instead, he waited until the summary judgment stage of litigation to raise this discovery issue.  The Federal Rules of Civil Procedure provide yet another approach to handling this type of issue.  Specifically, "Federal Rule of Civil Procedure 56(f) provides that where a 'party opposing the [summary judgment] motion cannot for reasons stated present by affidavit facts essential to

justify the party's opposition, the court may…order a continuance to permit affidavits to be obtained or depositions to be had…." *Grayson v. O'Neil*, 308 F.3d 808, 815 (7th Cir. 2002) (quoting Fed.R.Civ.P. 56(f)). Mr. Fulmore did not seek this either. As such, the Court concludes that the fact that Mr. Fulmore did not receive certain documents in his request for production of documents from M&M is not fatal to M&M's designations for the partial summary judgment motion.

**B.      Title VII Discrimination and Retaliation Claims**

Mr. Fulmore initially alleges that M&M intentionally discriminated against him on the basis of his race in violation of Title VII when it terminated his employment in February 2010. Under Title VII, it is unlawful for any employer to "fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. In a Title VII discrimination suit, a plaintiff may show discrimination in one of two ways: either (1) through the "direct" method, or (2) by relying on the "indirect," burden shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 681 (7th Cir. 2007). Under the direct method, a plaintiff must prove an employer's decision to terminate him was motivated by his race by "offering direct evidence, such as an admission of discrimination, or sufficient circumstantial evidence that points directly to a discriminatory reason" for his termination. *Jennings v. Ill. Dep't of Corr.*, 496 F.3d 764, 767 (7th Cir. 2007). Under the indirect method, to make out a *prima facie* case, Mr. Fulmore must prove that: (1) he is a member of a protected class, (2) he performed his job to the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) his employer treated similarly situated

employees outside his protected class more favorably.  *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002).

Once the *prima facie* case is established, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*  The burden is one of production and not persuasion.  *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142 (2000).  It cannot, therefore, involve a credibility assessment.  *Id.*  If the defendant is successful in rebutting the plaintiff's *prima facie* case with a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to establish the reason proffered by the defendant was pretextual.  *Salvadori*, 293 F.3d at 996.   Mr. Fulmore attempts to proceed under both the direct method and the burden shifting method.  M&M counters by arguing that he has not set forth sufficient evidence to defeat its motion with respect to either method.  Specifically, Mr. Fulmore argues that there is sufficient evidence to demonstrate the existence of a hostile work environment and intentional race discrimination in violation of Title VII.  By contrast, M&M argues that stray remarks made by its managers and employees did not constitute a hostile work environment.  Moreover, M&M asserts that Mr. Fulmore did not meet his employer's legitimate work expectations or identify a similarly situated employee who was treated more favorably. The Court will now address these issues in turn.

### 1.    Mr. Fulmore's Hostile Work Environment Claim

As discussed previously, Mr. Fulmore may establish a violation under Title VII by proving that M&M subjected him to a hostile work environment.  *See Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004).   To survive a summary judgment motion on his hostile work environment claim, Mr. Fulmore needs to establish the following: (1) his work environment was both objectively and subjectively offensive; (2) the harassment complained of

was based on his race; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). Additionally, to rise to the level of a hostile work environment, the conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment. *Id.* (citing *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005)). Moreover, an objectively hostile environment is one in which a reasonable person would find hostile or abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). In determining whether a plaintiff meets this standard, courts consider all the circumstances, including the severity of the allegedly discriminatory conduct, its frequency, whether it's physically threatening or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Id.* at 23. However, "[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Id.* (citing *Adusumilli v. City of Chi.*, 164 F.3d 353, 361-62 (7th Cir. 1998)).

Turning to the elements discussed above, the first question is whether the comments made by M&M's employees created an objectively hostile work environment for Mr. Fulmore. In both his second amended complaint and the EEOC complaint, Mr. Fulmore claims that two white managers, Mr. McCormick and Mr. Sperry, uttered "nigger" and "black motherfucker" during the course of his employment. Dkt. 48-7 at 2 and Dkt. 26 at 2-3. "Given American history, [the Seventh Circuit] recognize[s] that the word 'nigger' can have a highly disturbing impact on the listener." *Hrobowski*, 358 F.3d at 477; *see also Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984) (recognizing that "use of the word 'nigger' automatically separates the person addressed from every non-black person"). Additionally, Mr. Fulmore asserts that white employees made other racially hostile comments including "referring to it being cold on

14

President Obama's inauguration day because it was a cold day in hell when he became President and saying it was a day when pigs flew." Dkt. 26 at 3, ¶ 13.  In considering the evidence in the light most favorable to the non-moving party, Mr. Fulmore was exposed to these offensive comments made by other employees throughout his employment at M&M.  Further, M&M does not dispute that its employees and managers made the racial remarks.  As such, the Court concludes that being subjected to hearing such offensive language "during the course" of one's employment could lead a reasonable jury to conclude that Mr. Fulmore was exposed to an objectively hostile work environment. *See Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 2004).

As to the subjective requirement, all Mr. Fulmore has to establish is that he perceived the environment to be hostile or abusive. *See Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 695 (7th Cir. 2001). Here, Mr. Fulmore says he was treated less favorably because of his race, and as such, complained about discrimination to M&M's management.  A reasonable jury could conclude that Mr. Fulmore subjectively perceived his work environment to be hostile; therefore, he has established the first prong of his hostile work environment claim. *See Hrobowski*, 358 F.3d at 477.

Next, with respect to whether the alleged harassment was based on race, there is no dispute on this issue.  Here, the offensive comments allegedly uttered by M&M employees were unambiguously racial epithets.  Thus, the second prong of Mr. Fulmore's hostile work environment claim is satisfied.

Under the third prong, Mr. Fulmore must establish that the offensive racial epithets and other offensive language uttered by M&M's managers and employees were either severe or pervasive. As discussed previously, courts look at the totality of the circumstances when

assessing the severity or pervasiveness of the conduct.  *See Rodgers*, 12 F.3d at 674. Specifically, courts consider the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance.  *See Russell v. Bd. of Trustees of Univ. of Illinois at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001).  Concerning the racial epithets uttered by Mr. Sperry and Mr. McCormick, the Seventh Circuit stated that "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment, than the use of an unambiguously racial epithet such as 'nigger'...."  *See Rodgers*, 12 F.3d at 675.  Moreover, Mr. Fulmore indicated that the managers also uttered other abusive language such as "black motherfucker" as well as mocked the race of President Obama.[2]  And, Mr. Fulmore claims these comments were made over the course of his employment.  Looking at the totality of the circumstances, while it is unclear how many times these racial epithets were uttered, it is evident that the nature of these remarks was so severe and offensive that they sufficiently altered the terms and conditions of Mr. Fulmore's employment.  *See id.* at 675-76; *Bailey*, 583 F. Supp. at 927.  As such, the Court concludes that Mr. Fulmore has established the third prong by providing sufficient evidence of the severity of the alleged hostile conduct.

Lastly, Mr. Fulmore must establish that there is a basis for attributing employer liability upon M&M for the actions of its employees.  Generally, the standard for employer liability with respect to a hostile work environment claim rests on whether the harasser is the victim's

---

[2] Mr. Fulmore asserted in a his Charge of Discrimination statement to the EEOC on March 24, 2010 that the M&M managers referred "to it being cold on President Obama's inauguration day because of it being a cold day in hell and referring to it being a day when pigs flew, making a connection to swine flu."  Dkt. 48-7 at 2. The Court was not familiar with the racial connotation of these idioms; however there is internet chatter in this regard. *See* http://beforeitsnews.com/prophecy/2012/08/the-fall-of-the-united-states-of-babylon. "I remember when in the very early days of Obama's campaign, people were saying, "The day that Obama becomes President is the day pigs will fly." Obama was elected, and I have been looking around to see if any pigs were flying and sure enough— swine flu (flew)".

supervisor or merely a co-employee.  *Hrobowski*, 358 F.3d at 477 (citing *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)).  In particular, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Parkins*, 163 F.3d at 1032.  However, in the absence of supervisory authority, an employer will be liable for a co-employee's harassment only when they have been negligent either in discovering or remedying the racial harassment.  *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1032 (7th Cir. 1998).

In the present case, Mr. Fulmore has not established that Mr. Sperry and Mr. McCormick, as managers, had supervisory authority over his work.  Consequently, to establish the fourth prong of his claim, he must present evidence that M&M was negligent in discovering or rectifying the racial harassment.  In establishing employer liability, notice or knowledge of the harassment is a prerequisite for liability.  *Parkins*, 163 F.3d at 1035.  Further, in determining whether an employer received notice, courts will look at whether a complainant informed a department head or someone that he or she reasonably believed was authorized to receive and respond to a complaint of harassment.  *Id.*  As evidence of M&M's negligence, Mr. Fulmore designated his Charge of Discrimination form to the EEOC.  *See* Dkt. 48-7 at 2.  On the form, he indicated that he reported incidents of racial harassment to the owner of M&M; however, the company did not take any appropriate action to address the harassment.  Dkt. 48-7 at 2.  In viewing the facts in the light most favorable to Mr. Fulmore, a reasonable jury could conclude that M&M had adequate notice of the harassment because Mr. Fulmore reasonably believed that the owner would have the authority to deal with the harassment issue.  *See Young v Bayer Corp.*, 123 F.3d 672, 675 (7th Cir. 1997) (determining a genuine issue of material fact existed regarding

defendant's negligence in responding to a claim of harassment after it was reported by plaintiff to her department head).  As such, the Court concludes there is a genuine issue of material fact regarding M&M's negligence in responding to Mr. Fulmore's complaints of racial harassment. Accordingly, the Court finds that M&M is not entitled to summary judgment on Mr. Fulmore's hostile work environment claim under Title VII.

### 2.      Mr. Fulmore's Race Discrimination Claim

Mr. Fulmore also alleges that he has sufficient evidence to establish a race discrimination claim against M&M under Title VII.  As discussed previously, to establish the *prima facie* case for a race discrimination claim, the plaintiff must demonstrate: (1) he belongs to a protected class; (2) his performance met his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) similarly-situated employees not in his protected class received more favorable treatment.  *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009).  M&M argues that Mr. Fulmore cannot survive summary judgment with respect to this issue because his safety record did not meet its legitimate performance expectations, and he has not identified a similarly situated employee.  Mr. Fulmore attempts to counter M&M's assertion be claiming that a majority of the accidents he was involved with were not his fault.

M&M points to several pieces of evidence demonstrating that Mr. Fulmore's performance was unsatisfactory.  In particular, M&M emphasizes the six accidents Mr. Fulmore was involved in since 2006 as well as the speeding citations he incurred as an over-the-road truck driver.  As evidence of Mr. Fulmore's unsatisfactory performance, M&M designated at least three warning letters he received regarding those accidents and speeding citations.  These letters indicate that M&M found the accidents to be preventable accidents or violations that he incurred during his employment which would result in further disciplinary action including termination.

Even after receiving these warning letters, the undisputed evidence indicates that Mr. Fulmore continued to experience driving incidents and accidents and receive speeding citations while on the job.

Despite this evidence of a poor driving record, Mr. Fulmore contends that he has put forward sufficient evidence, through his affidavit, which creates a factual dispute regarding the adequacy of his work performance. The Court disagrees. In his affidavit, Mr. Fulmore indicates that his June 6, 2007, January 23, 2008, October 27, 2009, and February 10, 2010 accidents were not his fault or not preventable. *See generally* Dkt. 48-2. Unfortunately for Mr. Fulmore, he cannot create a material issue of fact based only on his self-serving statements in his affidavit. *See Lee v. Wal-Mart Stores*, No. 94-2154, 1996 WL 102446, at *3 (7th Cir. 1996) ("Plaintiff's affidavit contains only self-serving statements that she believes discrimination occurred, which are not sufficient to raise a genuine issue of material fact."). Furthermore, many of Mr. Fulmore's statements in his affidavit challenging the accident findings by M&M Safety Manager, Mr. Cooper, regarding the cause of the driving accidents likely constitute inadmissible hearsay. Mr. Fulmore also has failed to designate evidence such as police reports or other sworn affidavits demonstrating that the accidents he experienced were not preventable.[3] "In the face of this evidence of inadequate performance, the plaintiff cannot raise a material issue of fact on the question of the quality of [his] work merely by challenging the judgment of [his] superiors...." *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1264 (7th Cir. 1993). As such, Mr. Fulmore has not produced evidence indicating that his performance met his employer's legitimate

---

[3] For example, in his affidavit (Dkt.48-2), Mr. Fulmore alleges M&M's safety director in Evansville told him that the June 6, 2007 incident was not an accident and on October 27, 2009 the security guard named Gloria, told him the other driver was in a big hurry, and Norman Brennan told him it was not anything reportable. However, Mr. Fulmore has failed to provide affidavits from these witnesses.

expectations.[4]  Because Mr. Fulmore cannot demonstrate the third prong of his *prima facie* case, his race discrimination claim fails. [5]  Accordingly, the Court finds that M&MM is entitled to summary judgment on Mr. Fulmore's Title VII race discrimination claim.

### 3.  Mr. Fulmore's Title VII Retaliation Claim

As an initial matter, a plaintiff can show retaliation either through the direct or the indirect method.  Under the direct method, a plaintiff must present evidence of the following: (1) a statutorily protected activity; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action.  *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006).  Under the indirect approach, a plaintiff must establish a *prima facie* case of retaliation by offering evidence of the following: (1) that he was engaged in a protected activity; (2) that he was subject to an adverse employment action; (3) that he performed his job satisfactorily; and (4) that no similarly situated employee who did not engage in protected activity suffered an adverse employment action.  *Id.* at 759.  Mr. Fulmore argues that it has sufficient evidence to establish that M&M retaliated against him in violation of Title VII when it opposed his claim for unemployment benefits.

---

[4] Citing *Curry v. Menard*, 270 F.3d 473 (7th Cir. 2001), and *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486 (7th Cir. 2008), Mr. Fulmore seems to argue that because an employer cannot cite the same performance issues concerning an employee as a justification for their termination, a court must directly analyze the pretext issue. Mr. Fulmore misconstrues the Seventh Circuit's analysis in *Duncan*.  In *Duncan*, the Seventh Circuit articulated that "when an employer has cited performance issues as justification for its adverse action, the performance element of the prima facie case cannot be separated from the question whether the employer proffered a nonpretextual explanation for its challenged conduct." *Duncan*, 518 F.3d at 491.  After addressing this issue, the court analyzed pretext because the plaintiff had established all the elements of the *prima facie* case.  *Id.*  Unlike in *Duncan*, Mr. Fulmore has not established the third prong or the fourth prong of the *prima facie* case.  He has not presented evidence pointing to similarly situated employees who were treated more favorably than him.  Even assuming *arguendo* that he satisfied his *prima facie* case, Mr. Fulmore cannot show that M&M's legitimate, non-discriminatory reason for terminating him was pretextual.

[5] Because Mr. Fulmore has failed to establish his *prima facie* case for race discrimination, the Court need not address his pretext arguments.  *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1064 (7th Cir. 2003) ("A plaintiff does not reach the pretext stage, however, unless she first establishes a *prima facie* case of discrimination.").

Here, Mr. Fulmore's claim of retaliation under Title VII is without merit.  As discussed previously, to establish his retaliation claim, Mr. Fulmore must demonstrate that he was engaged in activity that is statutorily protected under Title VII.  42 U.S.C. § 2000e-3(a).  On this issue, the Seventh Circuit has stated that "applying for unemployment benefits is not actively protected under Title VII."  *Small v. WW Lodging, Inc.*, 106 Fed. Appx. 505, 508 (7th Cir. 2004).  Put another way, Mr. Fulmore was not opposing or complaining about discrimination based on race by his employer by filing for unemployment benefits.  *See Boman v. Atrium Cos. Inc.*, No. H-08-2185, 2009 WL 4059044, at *4 (S.D. Tex. Nov. 20, 2009) (granting summary judgment in favor of defendant after concluding that plaintiff's filing a request for unemployment benefits is not a protected activity under Title VII).  Because Mr. Fulmore has failed to allege or present evidence that he engaged in a protected activity under Title VII, M&M is entitled to summary judgment on Mr. Fulmore's Title VII retaliation claims.

## C.    Mr. Fulmore's Workman's Compensation Retaliation Claim

Next, Mr. Fulmore argues that M&M "intentionally retaliated against [him] with respect to his terms, conditions, and privileges of employment because he had a worker's compensation claim."  Dkt. 26 at 6-7, ¶ 38.  In *Frampton v. Cent. Ind. Gas Co.*, 297 N.E.2d 425 (Ind. 1973), the Indiana Supreme Court made it unlawful for an employer to discharge an employee in retaliation for filing a claim for worker's compensation.  *Id.* at 428.  "To survive summary judgment on a *Frampton* claim, the plaintiff must present evidence that would support a finding that discharge was caused by his filing for benefits."  *Mack v. Great Dane Trailers*, 308 F.3d 776, 784 (7th Cir. 2002); *Smeigh v. Johns Manville, Inc.*, No. 1:09-cv-0414, 2010 WL 3781492, at *5 (S.D. Ind. Sept. 22, 2010).  However, causation may not be inferred merely because the employee filed for benefits and was fired.  *Mack*, 308 F.3d at 784.  "Depending on the

circumstances, however, causation may be inferred from the rapidity and proximity in time between the employee's filing for benefits and the discharge." *Id.* As such, to establish a causal connection, plaintiff may rely on evidence of the proximity in time between the filing of the claim and the termination and evidence of pretext. *Smeigh*, 2010 WL 3781492, at *5.

With respect to temporal proximity, Mr. Fulmore appears to rely entirely on timing evidence to establish causation when there was twelve days between when he was injured and the time M&M drafted his termination letter. While this is a short period, the Seventh Circuit has stated that temporal proximity "is rarely sufficient in and of itself to create a jury issue on causation." *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781; *see Smeigh*, 2010 WL 3781492, at *5 (determining that a four day period between plaintiff's injury on his behalf was insufficient in and of itself to establish the requisite causal connection). As such, the Court will now turn to examine evidence related to pretext. "Causation may also be inferred from evidence of pretext, that is, evidence that the employer's proffered reason for the discharge is patently inconsistent with evidence before the court." *Mack*, 308 F.3d at 784 (quoting *Markley Enters., Inc. v. Grover*, 716 N.E.2d 559, 565 (Ind. Ct. App. 1999)) (internal quotations removed). As evidence of pretext, Mr. Fulmore claims that "M&M requested several times that Plaintiff come back to work after his accident on February 10, 2010." Dkt. 47 at 34. However, considering his proclivity to speed and crash into things with his truck trailer; and even when reviewing the evidence in the light most favorable to Mr. Fulmore, he has not presented sufficient evidence to establish that M&M's reason for terminating him was a lie. *See O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) ("Pretext means a dishonest explanation, a lie rather than an oddity or an error."). Accordingly, the Court concludes that M&M is entitled to summary judgment on this issue.

### D.      Mr. Fulmore's FMLA Interference Claim

Under Count IV of Mr. Fulmore's second amended complaint, he alleges that M&M interfered with his rights under the FMLA.  Pursuant to the FMLA, an eligible employee is entitled to twelve weeks of unpaid leave each year for a serious health condition.  *See* 29 U.S.C. § 2612(a)(1)(D).  An employer must not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights.  29 U.S.C. § 2615(a)(1).  The plaintiff carries the burden of proving an FMLA interference claim.  *Goelzer v. Sheboygan*, 604 F.3d 987, 993 (7th Cir. 2010).  Thus, to prevail on an FMLA interference claim, a plaintiff must establish that: (1) he was eligible for the FMLA's protections; (2) his employer was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) his employer denied him FMLA benefits to which he was entitled.  *Id.*  Here, M&M argues that it adopted a twelve month rolling period under its FMLA policy and, as such, it contends Mr. Fulmore exhausted his leave time when he took nine months off from work from August 2008 to May 2009.  Mr. Fulmore did not respond to M&M's substantive argument regarding whether he exhausted his leave under the FMLA.  Because Mr. Fulmore has not set forth evidence to rebut M&M's argument to establish that his FMLA rights were interfered with, he has not met his burden on this issue.  Accordingly, the Court concludes that M&M is entitled to summary judgment regarding Mr. Fulmore's FMLA claim.

### E.      Mr. Fulmore's Claims Under Indiana's Wage Payment and Wage Claims Statutes

Lastly, under Count V, Mr. Fulmore alleges that the "Defendant failed to pay when due wage claims of the Plaintiff pursuant to Indiana Code 22-2-5 and 22-2-9."  Dkt. 26 at 8, ¶ 42. Specifically, Mr. Fulmore seeks relief under Indiana's Wage Payment Statute as well as Indiana's Wage Claim Statute.  M&M argues, however, that based on the facts of the case, Mr.

Fulmore cannot seek relief under both set of statutes.  Mr. Fulmore, in his briefing on this issue, conceded that his wage claim falls within the Indiana Wage Claims Statute, not the Indiana Wage Payment Statute.  Accordingly, Mr. Fulmore's claim alleging violations of the Indiana Wage Payment Statute under Count V is dismissed.

## IV.   CONCLUSION

For the reasons set forth above, M&M's Motion for Partial Summary Judgment (Dkt. 33) is **GRANTED** in part and **DENIED** in part.  Specifically, M&M's motion is **granted** with respect to Mr. Fulmore's Title VII *prima facie* race discrimination claim under Count I and his Title VII retaliation claims under Count II.  Additionally, M&M's motion is **granted** with respect to Mr. Fulmore's worker's compensation retaliation claim under Count III and his FMLA claim under Count IV.  Finally, with respect to Count V, Mr. Fulmore's claim alleging a violation of Indiana's Wage Payment Statute is **DISMISSED WITH PREJUDICE.**  However, M&M's motion is **denied** with respect to Mr. Fulmore's hostile work environment claim under Count I and the remaining Indiana Wage Claims Statute claim under Count V.


SO ORDERED.

Date:   10/29/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana


DISTRIBUTION:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

Michael W. Padgett
JACKSON LEWIS LLP
padgettm@jacksonlewis.com

Melissa S. Vare
JACKSON LEWIS LLP
varem@jacksonlewis.com

Craig W. Wiley
JACKSON LEWIS LLP - Indianapolis
craig.wiley@jacksonlewis.com