UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CARL S. FULMORE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:11-cv-00389-TWP-TAB |
| | ) |
| M&M TRANSPORT SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
ITS MOTION FOR JUDGMENT AS A MATTER OF LAW**

Defendant, M&M Transport Services, Inc. ("M&M") by counsel, submits this brief in support of its motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). Defendant also incorporates by reference the arguments in its memorandum in support of its Rule 59 motion in further support of its Rule 50(b) motion.

## I. INTRODUCTION

M&M moves for judgment as a matter of law on Plaintiff Carl Fulmore's racial harassment claim because Fulmore failed to present sufficient evidence from which a reasonable jury could conclude that he satisfied two elements of a hostile work environment claim: (1) that the harassment he experienced was so severe or pervasive that it altered the conditions of his work environment by creating a hostile or abusive situation; and (2) that there is a basis for employer liability. Defendant also moves for judgment on Fulmore's claim for punitive damages.

## II. STANDARD OF REVIEW

The "[s]tandard governing Rule 50 motions mirrors that employed in a motion for summary judgment." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 746 (7th Cir. 2007) (quoting *Appelbaum v. Milwaukee Metro Sewerage Dist.*, 340 F.3d 573, 578 (7th Cir. 2003)). Thus, [i]n deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). If "no reasonable jury could have found for [Fulmore] on each essential element of his claim," then M&M Transport is entitled to judgment as a matter of law. *Harper v. Albert*, 400 F.3d 1052, 1061 (7th Cir. 2005).

## III. ARGUMENT

### A. M&M Transport is Entitled to Judgment as a Matter of Law on Fulmore's Hostile Environment Claim.

In order to prove a hostile work environment claim, Fulmore must establish four elements: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race [or other protected characteristic]; (3) the harassment was severe or pervasive so as to alter the conditions of his work environment by creating a hostile or abusive situation; and (4) there must be a basis for employer liability. *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004).

Fulmore testified he was subjected to three categories of harassing conduct: discriminatory discipline, discriminatory distribution of route assignments and racially offensive comments and jokes. Fulmore, however, failed to present sufficient evidence to establish the third and fourth elements of a hostile work environment claims: that the conduct he experienced was severe or pervasive and that there is a basis for employer liability.

1.  The Conduct Fulmore Experienced was not Severe or Pervasive So As To Alter the Conditions of his Employment

To determine whether conduct is sufficiently severe or pervasive to be actionable, courts look at all of the circumstances, including the frequency of the discriminatory conduct, how offensive a reasonable person would deem it to be, whether it was physically threatening or humiliating conduct as opposed to verbal abuse, whether it unreasonably interfered with an employee's work performance, and whether it was directed at the victim. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002). The Seventh Circuit has held that it will *not* find a hostile work environment for offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating. *Yancick v. Hanna Steel Corporation*, 653 F.3d 532, 544 (7th Cir. 2011).

   a.  Plaintiff's Alleged Disparate Discipline Does Not Support His Harassment Claim.[1]

Fulmore's testimony that he believed the discipline issued to him was due to his race is insufficient to support the verdict because the Court previously determined in its ruling on Defendant's motion for summary judgment that the discipline of Plaintiff was not discriminatory. Plaintiff's evidence also fails because it was based solely on his belief and not on actual evidence of disparate treatment.

The issue of disparate discipline was decided in favor of the Defendant on summary judgment. In his response to M&M's motion for summary judgment, Fulmore argued that he was meeting his employer's legitimate employment expectations because M&M "lied" about his disciplinary record because many of the accidents for which he was cited were not his fault.

---

[1] In its memorandum in support of its Rule 59 motion, Defendant argues that Plaintiff repeatedly violated the Court's rulings regarding the admissibility of evidence that his termination was motivated by race discrimination and further argues that Plaintiff also should not have been allowed to introduce evidence of discriminatory discrimination. Defendant incorporates by reference those arguments in further support of its Rule 50(b) motion.

3

(Dkt. 47, pp. 31-32)  The Court rejected the argument, noting that "[i]n the face of this evidence of inadequate performance, the plaintiff cannot raise a material issue of fact on the question of the quality of [his] work merely by challenging the judgment of [his] supervisors." (Dkt. 62, p. 19) (quoting *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1264 (7th Cir. 1993)).

Despite this ruling, Fulmore attempted to re-litigate the issue at trial by asserting that disparate discipline supported his racial harassment claim.  But in order for conduct to be part of a racial hostile work environment claim, it must have a "racial character or purpose." *Yancick,* 653 F.3d at 544.  The Court's ruling on summary judgment foreclosed this argument.  As such, Fulmore's discipline does not support his racial harassment claim.  *See Silk v. City of Chicago*, 194 F.3d 788, 806 n.17 (7th Cir. 1999) (finding that the employee's five-day suspension could not be considered part of his harassment claim because he presented no evidence that the suspension was done for harassing or retaliatory reasons).

The Court also ruled that "unless there is evidence of supervisor racial harassment the issue of termination is not relevant, because co-workers have no power to terminate." (Tr., p. 48)[2]  Fulmore was issued discipline by supervisors John S. Forrest, Darin Kelley, Charles Cooper, and Len Mariotti. (Dkt. 35)  There was no trial evidence that any of those supervisors engaged in racial harassment.  Thus, the issue of Fulmore's discipline is not material to his racial harassment claim and does not support the verdict.

Assuming plaintiff was entitled to re-litigate the disparate discipline claim or his termination, his evidence is based solely on perception and belief, not on fact.  Specifically, Plaintiff testified he was disciplined for accidents he claimed were not his fault, while he thought white drivers were issued less discipline for similar accidents. (Tr., pp. 66-70)  The only

---

[2] The two days of the trial transcript are docketed at Dkt. 134 and 136 respectively. The pages of the two sections of the transcript are numbered consecutively.  In this memorandum, Defendant refers to the entire transcript as "Tr., p___."

4

instances Fulmore described at trial were that Gary McCormick and a driver with the last name of Killinger (both Caucasian), "topped a trailer" but were not terminated. (Tr., p.136) Fulmore did not give any examples of black drivers who topped trailers and were terminated, nor did he testify that he was terminated for that reason.[3] Plaintiff also did not identify any white drivers who engaged in the conduct for which he was disciplined but who received less severe punishment.

        b.        *The Route Assignments Do Not Support Plaintiff's Harassment Claim.*

Fulmore's testimony that he received inferior routes on the basis of race is similarly based only on his perception, and not on actual knowledge of the process by which routes were assigned or evidence that race actually influenced assignments. Fulmore testified generally that after Dave Raney became a dispatcher, he began to get fewer palletized routes and "realized" that less-senior white employees were getting routes he used to take.[4] (Tr., p. 64) On cross-examination, however, Plaintiff was able to identify only two occasions when another driver was given a route he desired. (Tr., p. 105) Fulmore did not establish why he should have received those two routes, and M&M's evidence was undisputed that many variables influenced route assignments, including unexpected cancellations, new assignments, retention of palletized routes for leased drivers, and how long drivers could work per day. (Tr., pp. 246-254)

The other witnesses who testified about preferential route assignments also *believed* that white drivers were given better routes, but identified only a few occasions when they did not receive a route they thought they should have received and, for those situations, they could not explain *why* they should have received the desired route. *See Ramos v. Commonwealth*

---

[3] "Topping" a trailer refers to damaging a trailer when driving under a bridge or viaduct. (Tr., p. 66)
[4] This is also about the same time that Norman Brennan was making material changes to the process for assigning routes. (Tr., pp. 260-271)

5

*Edison Company*, 2009 U.S. Dist. LEXIS 73867 *30-31 (N.D. Ill. August 20, 2009) (plaintiff's testimony and that of his co-workers that plaintiff was assigned more frequently to less desirable work was insufficient because the plaintiff did not offer any evidence of the jobs he was assigned as compared to his Caucasian co-workers; instead, plaintiff only presented his and others' "impressions").

A few witnesses testified that complaints about the dispatch process were common and that both white and black drivers expressed dissatisfaction with their route assignments. (Tr., pp. 201, 254, 274)  For example, Fulmore testified that Tonya Alvarez told him Rick Sperry held "preferential" routes for white employees. (Tr., p. 63)  Alvarez testified, however, that she did *not* know why the routes were being set aside and admitted this could have been done for business purposes. (Tr., pp. 155-57)  Sperry held a dispatch position for only three months in early 2008.  Accordingly, even if Plaintiff could establish that Sperry assigned routes on the basis of race, there is no evidence that the conduct continued for very long or that it ever impacted Fulmore. (Tr., p. 246)

      c.    *Comments Fulmore Heard In or About the Workplace Are Insufficient to Establish Race Harassment.*

The day after President Barak Obama was elected in 2008, Gary McCormick told Fulmore two jokes: (1) "You heard the reason why it's so cold out here today, isn't it? They said that the day a black man becomes president will be a cold day in hell and that's why it's so cold out here today;" and (2) "The day a black man becomes president will be the day when pigs fly and that's why we have the swine flu." (Tr., p. 57)[5]  Fulmore also testified that he heard Rick

---

[5] For the reasons discussed in the next section, the record shows that the election jokes occurred *before* M&M received any complaints about racial remarks and therefore do not support Plaintiff's hostile environment claim as a matter of law.  But even if they are considered in assessing whether the harassment was severe or pervasive, they are insufficient to establish this element of his claim.

6

Sperry say that at the inauguration they would probably serve fried chicken and watermelons, but acknowledges the comment was not directed to him. (Tr., pp. 58-59) Plaintiff testified that all of these comments were made in Fall 2008. (Tr., pp. 78-79) Fulmore complained to Brennan about the jokes shortly after they were told. (Tr., p. 78)

A few weeks later, while Fulmore was walking through the break room, he heard McCormick mutter "[t]hese motherfuckers are always complaining about stuff. You can't even joke around here anymore." (Tr., p. 58)[6] Fulmore believed the statement referred to black drivers who were complaining about the election jokes, although he offered no other testimony explaining the basis for that belief. (*Id.*) Around the same time, Fulmore heard one of the night dispatchers, Dave Raney, state "These niggers always complain about everything. You can't please them no matter what you do." (Tr. pp. 59, 81) Fulmore overheard this statement after he walked into the dispatch area, but believes Raney was not aware of his presence. (*Id.* at 80.) He also heard other drivers use the "n" word. (Tr., p. 84)[7]

On direct, Fulmore testified he heard Todd Gatling referred to as "Buckwheat" quite a bit and that he would hear racial statements "every week." (Tr., p. 60) On cross examination, however, Fulmore admitted that he heard Sperry refer to Gatling as "Buckwheat" only twice. (*Id.* at 81)

Fulmore testified that he heard comments when there was a "backup," referring to delays that occurred when CVS was behind on loading their trailers. (Tr., pp. 81-82) This would not

---

[6] This testimony indicates that employees were directed to stop making jokes about the election. It is a reasonable inference from the record that Brennan issued the directive after Fulmore complained to him.

[7] Fulmore was asked if he complained to anyone about hearing the "n" word. (Tr., p. 84) Fulmore did not answer "yes" or "no." (*Id.*) Instead, he gave this vague response: "We talked to Norm about all of our problems. And nothing tends to happen, so you just pretty much learn to stay away from it and go to the car." (*Id.*) No reasonable jury could conclude that this testimony established that Plaintiff reported to Brennan that the "n" word was being used by drivers. In fact, Fulmore later clarified that he complained to Norm Brennan twice (see above), but did not specifically state that he informed Brennan about the use of the "n" word. (Tr., p. 105)

always happen every week, but sometimes every other week. Some drivers waited in their cars during backups. (*Id.*) Others stood around, and this is when Plaintiff contends "all the joking and everything happened." (Tr., p. 83)  Shortly after President Obama's inauguration, Fulmore began to sit in his car when there was a backup. (Tr., p. 84)  He could not confirm that he heard any further comments after this point. (Tr. p. 84)  Rather, other employees (including Gatling) complained to him about comments *they* heard. (Tr. pp. 141, 200, 209)[8]

The only other testimony offered by Fulmore to support his racial harassment claim related to a racial joke told by Ken Fratantuono (referred to by witnesses as "Ken Frat" or "Frat") at a safety meeting. (Tr., p. 73)  Plaintiff's testimony on this issue was highly contradictory and clearly incredible. When first questioned about the joke by his attorney, Plaintiff stated that someone *complained* to him about a racial joke Fratantuono told at a meeting. He did not testify that he heard the joke himself. (Tr., p. 71)  When asked if the joke was made during his employment, he stated that it was "technically" made during his employment because he had not yet received his termination letter.[9] (Tr., p. 72)  Plaintiff also testified that, prior to learning of Fratantuono's racial joke, he had witnessed Fratantuono make a religious joke at an *earlier* safety meeting. (Tr., p. 73)  In rebuttal testimony, Plaintiff stated that he attended only *one* safety meeting during his tenure with M&M. Then, in direct contradiction of his prior testimony, Fulmore claimed he was *present* when Fratantuono told the racial joke. Based on his own testimony, Plaintiff's claim that he heard the racial joke is either seriously mistaken or false: 1) if it occurred in 2010 while he was off work, as he first stated, then he was not present to hear it,

---

[8] Notably, most of the racial comments Gatling described were not made during Fulmore's employment. For instance, the joke about fried chicken at the annual meeting, the "nigger rigged" comment, and the graffiti on the walls all occurred in 2010 and 2011, after plaintiff's employment ended. (Tr., pp. 213-215, 223-224)  There is similarly no evidence that Fulmore saw the offensive text message sent to Gatling. Comments heard by others, but which Fulmore did not experience, do not support a verdict that *Fulmore* was harassed.

[9] It is uncontested that Fulmore was off work from February 2010 when he was injured in a vehicle accident until he received his termination letter on March 17, 2010. (Tr., pp. 68, 72, 96)

8

and 2) he attended only one *earlier* safety meeting at which Fratantuono told the offensive religious joke, which means he could not have been at the *later* meeting where the racial joke was told.[10]

This conclusion is bolstered by Gatling's testimony that the religious joke occurred at the safety meeting in 2009 (during Plaintiff's employment and consistent with his testimony that he heard the religious joke at the only meeting he attended) and that the racial joke was told in 2011 (the year after Plaintiff's termination). (Tr., pp. 205, 213) Brennan also testified that the racial joke occurred in 2011. (Tr., p. 293) In sum, no reasonable jury could conclude that Plaintiff actually heard the offensive racial joke told by Fratantuono in 2011.

Collectively, the evidence at trial was insufficient to establish that Plaintiff experienced a hostile work environment that was severe or pervasive. "The more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference is that it had an effect on the terms and conditions of the plaintiff's workplace." *Yancick*, 653 F.3d at 545; *see also Yuknis v. First Student, Inc.*, 481 F.3d 552-56 (7th Cir. 2011). When comments are not being directed towards the plaintiff, "the impact of [such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *McPhaul v. Board of Commissioner of Madison County, Indiana*, 226 F.3d 558, 567 (7th Cir. 2000) (quoting *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997); *see also Ditty v. State of Indiana*, 2013 U.S. Dist. LEXIS 55277 *12 (S.D. Ind. April 17, 2013) ("Courts have held that

---

[10] In further support of its argument in this motion that Frantantuono's joke does not support the judgment, Defendant incorporates by reference the detailed procedural history of the evolution of Plaintiff's contention that he was present for and actually heard the joke, as presented in Defendant's memorandum in support of its Rule 59 motion for a new trial, including the fact that he never disclosed the joke prior to trial, that he first testified that he only heard about the joke, and that he only testified he actually heard the joke after listening to the testimony of other witnesses.

comments not made directly to the plaintiff, while offensive, are not actionable under Title VII.").

In *McPhaul*, the court held that the use of the word "nigger" by a co-worker "on a weekly basis" was insufficient to create a hostile work environment. *Id.* This is because the co-worker was not directing the statement at the plaintiff or anyone else. *Id.* Similarly, in *Peters*, the court concluded that use of the word "nigger" by a co-worker did not create a hostile work environment. 307 F.3d at 552. This case is similar to *McPhaul* and *Peters* in that Fulmore overheard racially offensive comments by *co-workers*, and that none of the comments – with the exception of the election jokes – were directed at him.

Other than the two election jokes made in his presence in November 2008, Plaintiff presented no evidence that the sources of the offensive remarks directed the comments at him or even knew he was present. He heard most of the comments over a short period of time; after that, he began waiting in his car when necessary due to backups or other delays. There is no indication any of these comments affected Plaintiff's work performance. *See McPhaul*, 226 F.3d at 568 (noting that plaintiff had failed to show how her co-worker using the "n" word affected her work performance); *Silk*, 194 F.3d at 808 (7th Cir. 1999) (holding that a police officer who experienced *direct* verbal abuse and threats of violence did not establish hostile work environment because the harassment did not materially alter the conditions of his employment). This is especially true here, where Plaintiff testified that he did not wait in the office or socialize with other drivers because he considered such conduct "working for free." (Tr., p. 90)

Lastly, Fulmore testified that most of the time he heard inappropriate statements while drivers were standing around joking, not in the context of racially hostile statements directed at African American drivers. *See Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir.

1997) ("The occasional vulgar banter . . . of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable.") Accordingly, Fulmore has not demonstrated that the racial comments and conduct in evidence at trial were sufficiently severe or pervasive to constitute a hostile work environment.

2. There is No Basis for Employer Liability.

Assuming Fulmore's work environment was sufficiently severe or pervasive to alter the conditions of his employment, he did not establish that M&M knew the environment was racially hostile. M&M "will not be liable for the hostile environment absent proof that it failed to take appropriate remedial measures *once apprised of the harassment.*" *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004). This means that the employer must have been on notice that there was conduct occurring that was sufficiently severe or pervasive to create a hostile work environment. *See Bombaci v. Journal Community Publishing Group, Inc.*, 482 F.3d 979, 985 n. 2 (7th Cir. 2007) (holding that an employee's knowledge of isolated sexual comments was not sufficient to notify the employer that plaintiff was being harassed because the comments did not come close to creating an actionable hostile work environment).

First, Defendant is not liable for any harm to Plaintiff flowing from the election jokes because there is no evidence Brennan knew of any race harassment issues before the jokes were told in November 2008. In order to establish that M&M was liable for any harm to Plaintiff from the election jokes, Plaintiff would have had to prove that M&M knew of racial harassment *prior* to November 2008, had a reasonable opportunity to respond to the issue and failed to do so. There is no such evidence in this record.

Second, some of the comments Fulmore described at trial (but notably did *not* report to Brennan) resulted from his co-workers' negative reactions to being directed to cease telling such

11

jokes in the workplace. It is reasonable to infer from the record that, although he might not have recalled it at trial, Brennan ordered employees to stop telling election jokes after Fulmore complained.[11]

Third, Fulmore testified that he did not give Brennan detailed information about most of the racial comments he described at trial. For example, he did not inform Brennan that he overheard McCormick mutter that "these motherfuckers are always complaining about stuff." (Tr., p. 79) He did not inform Brennan that he heard Raney state "these niggers always complain about everything." (*Id.* at 80.) He also did not specifically inform Brennan that he heard the "n" word used by co-workers.[12]

Fulmore complained only twice to Brennan about comments he heard in the workplace. The first time, he complained about the election jokes. (Tr., p. 105) The second time, he complained about the "general atmosphere in the company *as far as the drivers making off-color jokes.*" (*Id.*) But Plaintiff also described Fratantuono's religious joke as "off-color," (Tr., p. 73), showing that to Plaintiff, "off-color" did not necessarily refer to racial comments. Taken at face value, Plaintiff's complaints to Brennan could not reasonably have put him on notice that Fulmore was describing a racially hostile workplace.

The complaints by other employees to Brennan were equally limited. For example, Alvarez complained to Brennan about the election jokes and employees referring to Gatling as "Buttwheat." (Tr., p. 150) She did not complain about any of the other derogatory comments she heard on third shift. She offered no testimony that she notified Brennan about her concern that Sperry was setting aside preferential routes for white drivers. Instead, "she didn't say too much" and "kept to" herself. (Tr., p. at 148) Tony Webster did not complain to Brennan about

---

[11] *See, also*, Alvarez's testimony about Brennan's reaction to her complaint about the election jokes. (Tr., p. 140)
[12] *See* note 6, *supra*.

12

any of the racial comments he heard during his employment. (Tr., pp. 177, 182) Gatling testified that he complained to Brennan about individuals calling him "Buckwheat." (Tr., p. 218) There was no testimony, however, regarding *when* Gatling or Alvarez complained to Brennan about the offensive nickname, or if those complaints preceded or followed any injuries to Plaintiff.

Gatling complained to Brennan about the comment in which an employee told him he was not going to attend the company function because there would not be any fried chicken. (Tr., pp. 217-18) Brennan informed the individuals involved that the comments were inappropriate. (Tr., p. 285-86) Gatling did not report to Brennan that he heard the term "nigger-rigged," the text message he received from an employee, the graffiti on the bathroom walls (which had been cleaned the day following), or the election jokes. (Tr., pp. 208, 218)

Fulmore complained to Brennan numerous times about dispatch routes to which he was assigned; "When I complained to Norm Brennan about me not getting routes over guys that were less senior than I was, he looked at me one day and said, 'Well maybe I should just do away with seniority.'" (Tr., p. p. 74)[13] Fulmore testified that on only *one* occasion, he told Brennan: "Well, Norm, you have a white guy that got a route. He's only been here a few weeks, and I wanted the route. I didn't even have a route." (Tr., p. at 89) Plaintiff's complaint about a single route assigned to a white driver, given the uncontested complexities of the dispatching process, was not sufficient to put a reasonable person in Brennan's position on notice that Fulmore was complaining about a racially hostile work environment. This was corroborated by Brennan, who testified that Fulmore came to him several times to discuss dispatch but that Fulmore never told him he believed he was not getting routes because of his race. (Tr., p. 276)

---

[13] There is no racial content in this complaint or Brennan's response. In fact, Brennan's response is consistent with his observation that the former seniority system was unfair to less senior drivers, caused too much turn-over among drivers, and resulted in lower levels of customer service. *See,* Tr., pp. 265-272.

These complaints collectively were insufficient to put M&M on notice that Fulmore was working in a racially hostile environment. In *Hrobowski v. Worthington Steel Co.*, an employee claimed he repeatedly heard the word "nigger" and was even told on more than one occasion by a manager that he should talk to an employee "nigger to nigger." 358 F.3d 473, 477 (7th Cir. 2004). When complaining to his supervisors about these comments, however, he testified that he complained "a couple of times" to a supervisor about the offensive remarks he heard and the supervisor told him he brought it on himself. *Id.* The court held this evidence was insufficient to establish liability because the employee did not make it clear what specifically he said to the supervisor. *Id.* at 479. Hrobowski also claimed that he spoke to another supervisor about "the language used, the racial jokes, and how they were an everyday occurrence." *Id.* The court concluded that this was also insufficient because it was not enough to put the employer "on notice that a hostile environment existed in its workplace." *Id. See also Silk*, 194 F.3d at 807 (one complaint to management about one incident was not sufficient to put the employer on notice that the harassment was widespread and persistent); *Bobaci*, 482 F.3d at 985, n. 2 (employer's knowledge of isolated incidents of sexual jokes insufficient to notify employer of sexual harassment); *McPherson v. City of Waukegan*, 379 F.3d 430, 434, 441 (7th Cir. 2004) (supervisor's knowledge of employee's supervisor asking female employees what color their bra was and if it matched their underwear was not sufficient notice because this comment did not amount to actionable hostile work environment.)

Defendant's anti-harassment policy expressly prohibited race harassment and directed employees to complain to their manager, the controller or the president. (Def. Ex. 200 at 6). There is no evidence that *any* complaints were forwarded by anyone, directly or indirectly, to the controller or the president. The complaints made to Brennan when viewed in their totality, were

insufficient to put the M&M on notice of racial harassment and charge it with negligence for failing to respond appropriately. *Hrobowski*, 358 F.3d at 478 (7th Cir. 2004)

Lastly, plaintiff failed to establish any temporal or causal relationship between the complaints made to Brennan and any injury that he suffered as a result of any negligent response to those complaints by Brennan or M&M. For all of these reasons, judgment should be entered for Defendant on Plaintiff's race harassment claim.

**B.** **At a Minimum, M&M is Entitled to Judgment as a Matter of Law as to Punitive Damages.**

In order to support an award for punitive damages, Plaintiff must prove that M&M engaged in a discriminatory practice with malice or with reckless indifference to the federally protected rights of Fulmore. 42 U.S.C. § 1981a(b)(1). To act with "malice" or reckless indifference," the employer must have knowledge that may be acting in violation of federal law. *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 535 (1999). In order to be eligible for punitive damages, the employer's conduct must be "considerably more blameworthy" than "carelessness" or "general thoughtlessness." *E.E.O.C. v. Ind. Bell Tel. Co.*, 256 F.3d 516, 527 (7th Cir. 2001); *see also Gile v. United Airlines, Inc.*, 213 F.3d 365, 375-76 (7th Cir. 2000) (upholding judgment as a matter of law denying punitive damages because the employer acted with *negligence* not recklessness).

Even if we assume Brennan had notice of race harassment and failed to take reasonable steps to address it and that his negligence caused identifiable injury to the Plaintiff, none of which Plaintiff has established, there is no evidence that Brennan was malicious or acted with reckless indifference in a manner that would support a punitive damages award. First, nothing in the record remotely suggests Brennan was malicious. Even Plaintiff did not argue that he was. (Tr., p. 329)

15

Nor did Brennan act with reckless indifference. He caused the election jokes to stop after Fulmore complained, he held a job open for Fulmore when he was injured, he gave Fulmore a favorable assignment when he needed help with child care, and he reprimanded the individuals who offended Gatling by joking about fried chicken at a company outing. No reasonable jury could conclude from this behavior that Brennan was recklessly indifferent to race harassment. *See Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1133 (7th Cir. 1997) (holding that the record did not support an award of punitive damages in part because "[t]he issue of liability in this case was extremely close"); *see also Kolstad*, 527 U.S. at 534 (noting that Congress "inten[ded] to authorize punitive awards in a subset of cases involving intentional discrimination" and "plainly sought to impose two standards of liability – one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award.")

Plaintiff was required to prove that the employer acted with knowledge that its actions may have violated federal law. *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001), citing *Kolstad*, 527 U.S. at 535. This inquiry turns on whether there is "evidence that would allow a reasonable inference that the employer in fact perceived a risk that its actions would violate federal law." *EEOC v. Oak-Rite Mfg. Corp.*, 2001 U.S. Dist. LEXIS 15621, *46 (S.D. Ind. Aug. 27, 2001). Plaintiff has provided no evidence that Brennan perceived a risk that the complaints addressed to him evidenced a violation of Title VII or 42 U.S.C. §1981, *i.e.*, that the comments were severe or pervasive enough to constitute a hostile work environment which would violate the protections of federal law. There also is no circumstantial evidence that the perceived risk was so obvious to Brennan that knowledge of the risk could reasonably be

inferred. *See e.g., Oak-Rite Mfg. Corp.*, 2001 U.S. Dist. LEXIS 15621, at *48. M&M is entitled to judgment as a matter of law on the punitive damages claim.

### IV.   CONCLUSION

For the foregoing reasons, M&M prays for judgment as a matter of law in its favor and against Plaintiff. In the alternative, M&M prays for judgment as a matter of law on the issue of punitive damages.

Defendant also respectfully requests, pursuant to Fed. R. Civ. P. 50(c), that in the event the Court grants its motion for judgment as a matter of law, it also conditionally rule on its motion for a new trial, and state the grounds for conditionally granting or denying the motion for a new trial.

    Respectfully submitted,

/s/ Michael W. Padgett
Michael W. Padgett
Jackson Lewis LLP
10 West Market Street, Suite 2400
Indianapolis, Indiana 46204
Tel:   (317) 489-6930
Fax:   (317) 489-6931
E-mail:  padgettm@jacksonlewis.com

Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2013, a copy of the foregoing *Defendant's Brief in Support of Its Motion for Judgment as a Matter of Law* was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

        Richard L. Darst
        Cohen, Garelick & Glazier
        8888 Keystone Crossing Boulevard, Suite 800
        Indianapolis, Indiana 46240-4636
        rdarst@cgglawfirm.com

        /s/ Michael W. Padgett
        Michael W. Padgett

4832-5136-8469, v. 1